# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| David L. Kukowski, | File No. 16-cv-01260 (SRN/DTS) |
| **Plaintiff,** | |
| | **MEMORANDUM OPINION AND** |
| v. | **ORDER** |
| Soo Line Railroad Company, d/b/a Canadian Pacific, | |
| **Defendant.** | |

---

Cortney S. LeNeave and Thomas W. Fuller, Hunegs, LeNeave & Kvas, PA, 1000 Twelve Oaks Center Drive, Suite 101, Wayzata, MN 55391, for Plaintiff.

Eugene C. Shermoen, Jr., Jennifer K. Eggers, Lee A. Miller, Sally J. Ferguson, and Timothy J. Carrigan, Arthur, Chapman, Kettering, Smetak & Pikala, PA, 81 South 9th Street, Suite 500, Minneapolis, MN 55402, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on motions for partial summary judgment filed by both parties. Defendant Soo Line Railroad Company ("Defendant") filed a Motion for Partial Summary Judgment ("Def.'s Mot.") [Doc. No. 26] on Count Two of Plaintiff's Complaint and on any claim related to locomotive crashworthiness. (*See* Def.'s Supp. Mem. [Doc. No. 41].) For his part, Plaintiff David L. Kukowski ("Plaintiff") filed a Motion for Partial Summary Judgment ("Pl.'s Mot.") [Doc. No. 30] on one aspect of Count Three of his Complaint and on Defendant's contributory negligence defense. For the reasons set forth below and as detailed herein, Defendant's Motion for Partial Summary Judgment is granted and Plaintiff's Motion for Partial Summary Judgment is granted in part and denied in part.

## I.     BACKGROUND

Plaintiff brought this action seeking to recover damages for injuries he sustained in an incident while working as a conductor on one of Defendant's trains. The Court recounts the facts that are undisputed and notes where material disputes arise.

### A.  Relevant Facts

In May 2014, Plaintiff was 56 years old and had been working for Defendant for approximately 23 years, primarily as a switchman/conductor on Defendant's trains. (Ex. 3 to Fuller Decl. [Doc. No. 33-3] ("Kukowski Dep.") at 6, 12.) On the morning of May 2, 2014, Plaintiff reported to work at a railroad station in Portal, North Dakota. (*Id.* at 93–94.) Plaintiff was one of two crew members assigned to take train 292-30 southeast to Harvey, North Dakota.   (*Id.* at 94–96, 150.) The other crew member was locomotive engineer Timothy Bergstad. (*Id.* at 94.) Train 292-30 consisted of two locomotives and 154 rail cars. (*Id.* at 95.) The "lead locomotive" was at the front of the train, and the second locomotive was at the end of the train. (*Id.*)

The crew departed the Portal station on train 292-30 before 9 a.m. (Ex. C to Carrigan Aff. [Doc. No. 29-3] ("Train Delay Report").) En route to Harvey, the train had to make a stop at the Lake Darling railroad crossing to wait for repairs to another train that was ahead. (Kukowski Dep. at 97–98.) The stop at Lake Darling lasted approximately 35 minutes. (*Id.*; Ex. 10 to Fuller Decl. [Doc. No. 33-10] ("Bergstad Dep.") at 21–22.) Sometime before the train left Lake Darling, a dispatcher for Defendant notified the crew via radio that Track Warrant 4558 had been "okayed" for them. (Kukowski Dep. at 144–55; Ex. D to Carrigan

Aff. [Doc. No. 29-4] ("Burlaga Dep.") at 54.) As Plaintiff explains, a "track warrant gives [crews] the authority to proceed from one station to the next." (Kukowski Dep. at 140.)

Of paramount importance here, Track Warrant 4558 also advised the crew that they should be prepared to stop their train up ahead to ensure that a switch at Foxholm, North Dakota, was properly lined up in the direction of their train's travel. (*Id.* at 100, 144; Bergstad Dep. at 22; *see also* Ex. G. to Carrigan Aff. [Doc. No. 29-7] ("Investigative Hr'g Tr.") at 10–11.) If a switch is lined up against the direction of a train's travel, it is necessary to stop the train before it goes through the switch. (Kukowski Dep. at 100.) Failure to do so presents a risk of train derailment and/or damage to the track switch. (*Id.*)

It is undisputed that before departing Lake Darling, both Plaintiff and Bergstad knew that their train should proceed toward the east siding switch at Foxholm and be prepared to stop. (*Id.* at 100.) At his deposition, Plaintiff agreed that he learned from dispatch, prior to leaving Lake Darling, that it would be necessary for him to check that the east siding switch at Foxholm was properly positioned. (*Id.* at 100, 144–45.) Similarly, Bergstad testified that before leaving Lake Darling, he knew of the track warrant indicating that the crew should proceed to Foxholm but be prepared to stop before the switch. (Bergstad Dep. at 22–23.)

However, the parties dispute whether Plaintiff and Bergstad held a "job briefing" after they received Track Warrant 4558. Plaintiff explained that a job briefing is generally held to talk about what the crew will do from the time it departs until it arrives at its destination and includes discussing issues of safety. (Kukowski Dep. at 100–01.) Defendant's internal operating rule, "CP Safety Rule T-0 Job Briefings," states that a "Job Briefing" "is led by the conductor/foreman and all crew members must have a clear

3

understanding of the tasks to be performed prior to commencing any work and/or when work conditions change." (Ex. K to Carrigan Aff. [Doc. No. 29-11] at 2; *see also* Ex. N to Carrigan Supp. Aff. [Doc. No. 40-1] ("Wolf Report") at ¶ 6.) Plaintiff testified that the last job briefing he remembers participating in before the incident was "right at the Lake Darling crossing," and that it involved discussing the crew's need to "[r]e-line the switch at Foxholm." (Kukowski Dep. at 102.)

Bergstad's testimony regarding the job briefing is somewhat inconsistent. At Defendant's investigative hearing, Bergstad was asked: "When you stopped at Lake Darling crossing and before you proceeded, did you have a job briefing about the east siding switch at Foxholm?" (Investigative Hr'g Tr. at 9.) To this, Bergstad responded, "I don't remember so. . . . [A]s far as when we took off from Lake Darling, I do not remember talking about it." (*Id.*) However, at his deposition, Bergstad agreed that the crew got notice of the Foxholm switch within five minutes of leaving Lake Darling, and discussed the need to stop up ahead. (Bergstad Dep. at 21–23.) And when Plaintiff's counsel asked Bergstad if such discussion "would have been a timely job briefing," negating "any reason . . . to review [the track warrant] again," Bergstad answered "yes." (*Id.* at 19.)

At approximately 11:27 a.m., the crew departed Lake Darling and headed toward Foxholm, which is less than two miles away. (Kukowski Dep. at 99; Bergstad Dep. at 22.) When the train left, both Plaintiff and Bergstad were seated in the cab of the lead locomotive, with Bergstad at the engineer's side manning the train's controls. (Kukowski Dep. at 104.) Plaintiff testified that as the train approached Foxholm, but while the crew was still "quite a ways away from" the switch, he noticed that it was facing the wrong direction.

(*Id.* at 105.) Plaintiff testified that he thus got up from his seat to put on his vest and get ready to disembark the train to make the necessary changes to the switch's orientation. (*Id.* at 105–06.)

The events that followed resulted in the train coming to an abrupt stop, causing serious injury to Plaintiff. Plaintiff testified that while he was standing and putting on his vest, he heard a noise and asked Bergstad what it was. (*Id.* at 107.) According to Plaintiff, Bergstad replied, "I dumped the air, put the train into emergency." (*Id.*; *accord id.* at 109–10.) Plaintiff testified that a split second later, he "flew head first right down into the nose [of the locomotive]" and hit his head on an overhead beam. (*Id.* at 107–09.) Plaintiff further testified that the next thing he remembers is Bergstad repeatedly asking him if he was okay. (*Id.* at 110) Plaintiff contends that as a result of this incident, he has headaches, problems with balance, constant loudness in his ears, and problems with his left knee. (*Id.* at 15–18.)

Bergstad's deposition testimony is generally in agreement with Plaintiff's recollection of events. Bergstad testified that as the train was approaching Foxholm, "[he] happened to look up and then realized the switch was against [the direction of travel]." (Bergstad Dep. at 8.) According to Bergstad, he then "dumped the air" and the train began to come to a slow stop. (*Id.*) However, he recalls that "just right as [the train] came to the stop, that's when the . . . slack action or the run-in occurred."[1] (*Id.* at 8–9.) Bergstad testified that as a result of the slack "running in," a knuckle connecting two of the train's cars broke, separating the train in two. (*Id.* at 11.) Describing what occurred to Plaintiff, Bergstad

---

[1] Defendant describes slack action to be "the sudden jolting of train cars caused by the force of the space/slack between cars running together or apart during train acceleration and deceleration." (Def.'s Mem. [Doc. No. 28] at 6 n.3.)

testified that "[Plaintiff] was . . . standing in the middle, facing forward like I was, sitting. And once that slack action ran in, he was propelled forward where he struck his head above the walkway there." (*Id.* at 9.)

Both Plaintiff and Bergstad testified that Bergstad used the emergency brake because he "forgot" about the need to check the switch. When Plaintiff's counsel asked Bergstad if he had to resort to using the emergency brake to stop the train because he had forgotten about the switch, Bergstad answered "yes." (*Id.* at 18, 20.) Similarly, Plaintiff testified that after the incident, Bergstad told him that "[he] forgot all about [the switch]." (Kukowski Dep. at 169, 107 ("I know he said, 'I kind of forgot about it.'").) Bergstad conceded that had he not forgotten about the switch, he would not have had to use the emergency brake. (Bergstad Dep. at 20; *see also* Kukowski Dep. at 138 (agreeing that "in the normal course of things," an emergency stop is not needed for a switch).)

The parties dispute whether Plaintiff also forgot about the switch after the crew departed Lake Darling. At Defendant's internal investigative hearing, when Plaintiff was asked "why the [train's] air ha[d] to be voluntarily dumped," he stated, "I was taking— doing my road block. Then it just—I accidentally forgot about the switch." (Investigative Hr'g Tr. at 17.) However, at his deposition, when asked if he had forgotten about the switch, Plaintiff replied, "No, because I reminded [Bergstad] . . . ." (Kukowski Dep. at 107.) According to Plaintiff, he kept a note "right in front of [him]" in the locomotive to keep reminding himself about the need to "restore" the switch at Foxholm. (*Id.* at 107–08.)

The parties also dispute whether Plaintiff "reminded" Bergstad of the need to check the switch after the crew departed Lake Darling. Pursuant to GCOR Rule 1.47(A)(3), "[t]he

conductor must remind the engineer that the train is approaching an area restricted by: . . .Track warrant . . . ." (*See* Ex. J to Carrigan Aff. [Doc No. 29-10] at 5; *see also* Wolf Report ¶ 6.).) Plaintiff testified that when the train was approximately a mile away from the switch, he told Bergstad, "we gotta restore the switch on the track warrant." (Kukowski Dep. at 106–07.) Plaintiff claims that Bergstad heard this statement and responded "Yup, I got 'er," or something to that effect. (*Id.* at 106.) Bergstad has a different recollection. At his deposition, when asked if Plaintiff had said anything to him about the switch after the train left Lake Darling, Bergstad answered, "not that I remember." (Bergstad Dep. at 24.)

After the train came to a stop, more of Defendant's employees arrived on the scene and replaced the broken knuckle. (Kukowski Dep. 113–17.) Bergstad then moved the front segment of the train backward so that the two segments could be reconnected and the train could depart the scene. (*Id.* at 117.) One of Defendant's trainmasters, Keith Hanson, inspected and photographed the knuckle. (Ex. O to Carrigan Supp. Aff. [Doc. No. 40-2] at 12–13.) Although Hanson took photographs, Defendant did not retain the knuckle after the incident.[2]

Although there is no dispute that a knuckle connecting two railcars broke, there is vigorous disagreement as to whether the two train segments collided, or what role the broken knuckle played in the train's sudden stop and Plaintiff's injuries. Plaintiff's expert, Paul Byrnes, opined that after the knuckle broke, "the rear of the train r[an] into the front of the train." (Ex. S to Carrigan Supp. Aff. [Doc. No. 40-6] at 40.) It is his opinion that after

---

[2] Plaintiff disputes that the "knuckle photographed by Defendant is in fact the actual broken knuckle." (Pl.'s Mem. [Doc. No. 32] at 5.)

the train separated, the two train segments acted as an "anvil" and "hammer." (*Id.*) According to Byrnes, the impact between the two train segments explains the "severe impact force" that the crew felt in the locomotive and which resulted in Plaintiff being "thrown very forcefully down into the nose." (*Id.*)

Defendant's expert, Gary Wolf, disagrees. Wolf opines that the "rear portion of the train never ran back into the front portion of the train after the train separation." (Wolf Report at 8.) Wolf claims that the train's recorder data shows a "gap of 116 feet between the front and rear portion of the train when it stopped," which is in fact why Bergstad had to reverse the front segment so that the train could be recoupled. (*Id.*) Moreover, Wolf believes that had there been a collision between the two segments of the train, "[Plaintiff] would have been thrown backward in to [sic] the rear wall of the locomotive," instead of forward, "as both [Plaintiff] and Mr. Bergstad have testified." (*Id.* at 9.)

After the team replaced the broken knuckle and the train left the scene, Plaintiff finished his shift, reported the incident to Defendant later that day, (Kukowski Dep. at 125–27), and went to the emergency room, (*Id.* at 59).

### B. Procedural Posture

On May 12, 2016, Plaintiff commenced legal action against Defendant, claiming that as a result of the incident on May 2, 2014, he suffered severe and permanent injury and disability. (*See* Compl. [Doc. No. 1] ¶ VI.) Plaintiff's Complaint sets forth three counts. (*Id.*) Count One alleges general negligence by Defendant in violation of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60. (*Id.* ¶¶ I–VI.) Count Two alleges that Defendant violated its operating rules and the Code of Federal Regulations, which in turn

caused Plaintiff's injuries, rendering Defendant strictly liable. (*Id.* ¶ VIII.) Finally, Count Three alleges that Defendant violated the Federal Safety Appliance Act ("FSAA"), 49 U.S.C. §§ 20301–20306, by hauling or using a railcar equipped with a defective coupler device, which injured Plaintiff. (*Id.* ¶ XI.)  On June 1, 2016, Defendant filed an Answer to Plaintiff's Complaint. (Def.'s Answer [Doc. No. 4].)  Among its affirmative defenses, Defendant pled contributory negligence.  (*Id.* ¶ 5.)

On July 27, 2017, Defendant moved for partial summary judgment on Count Two of Plaintiff's Complaint. (Def.'s Mot. at 1.) First, Defendant argues that there is no genuine issue of material fact as to whether it violated the Code of Federal Regulations. (*Id.*) Second, it argues that "Plaintiff cannot as a matter of law base a strict liability claim on Defendant's violation of any of [Defendant]'s internal safety rules that allegedly were violated." (*Id.*)

On July 28, 2017, Plaintiff also moved for partial summary judgment. First, Plaintiff urges the Court to grant summary judgment on its claim that Defendant violated the FSAA. (Pl.'s Mem. at 14–17.) Second, Plaintiff argues that it is entitled to partial summary judgment on Defendant's contributory negligence defense. (*Id.* at 17–24.)

On August 10, 2017, the magistrate judge held an informal telephone conference with the parties and ordered supplemental briefing regarding a new claim that Defendant alleged Plaintiff was raising long after the close of discovery. (*See* Min. Entry [Doc. No. 35]; Order [Doc. No. 36].)  On August 31, 2017, Defendant filed a brief supplementing his original motion, and moving for partial summary judgment as to any claim related to the "crashworthiness" of the locomotive. (*See* Def.'s Supp. Mem.) For the sake of clarity,

although there is but one motion for partial summary judgment filed by Defendant technically "pending" before this Court [Doc. No. 26], this order will refer to Defendant's supplemental briefing as a "supplemental motion" for partial summary judgment.

## II.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Morris v. BNSF Ry. Co.*, 817 F.3d 1104, 1107 (8th Cir. 2016). A fact is "material" only if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir.  2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), and the Court must view the evidence and any reasonable inference in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In responding to a motion for summary judgment, the opposing party "'may not rest upon the mere allegation or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256–57).  "[T]he

nonmoving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 910 (8th Cir. 2010) (quoting *Matsushita*, 475 U.S. at 586). "[O]nly evidence that would be admissible at trial may be relied upon to counter a motion for summary judgment." *Sokol & Assocs., Inc. v. Techsonic Indus., Inc.*, 495 F.3d 605, 611 n.4 (8th Cir. 2007).

### B.  Legal Framework

Under FELA, railroads have a duty to provide their employees with a reasonably safe place to work. *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 889 (8th Cir. 2012) (citation omitted). Enacted in 1908, the statute provides the exclusive remedy for a railroad employee who is injured as a result of his employer's negligence. *Id.* (citing 45 U.S.C. § 51). "Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted [this] federal remedy that shifted part of the 'human overhead' of doing business from employees to their employers." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994) (quoting *Tiller v. Atl. Coast Line R.R. Co.*, 318 U.S. 54, 58 (1943)). As such, "'[i]n order to further FELA's humanitarian purposes,' Congress removed various common-law obstacles to an employee's recovery, and courts have 'liberally construed FELA to further Congress's remedial goal.'" *Cowden*, 690 F.3d at 889–90 (internal citations and alterations omitted).

Nevertheless, FELA is not a strict liability statute, and a plaintiff must establish that his employer was negligent. To do so, a plaintiff may proceed in two ways. He can either establish a prima facie case of negligence by proving the same elements as are found in a common law negligence action, *Davis v. Burlington N., Inc.*, 541 F.2d 182,

185 (8th Cir. 1976), or he may prove that his employer violated a railroad safety statute such as the FSAA or the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701, *et seq.*, *see Urie v. Thompson*, 337 U.S. 163, 189 (1949). If an employee can establish a violation of the FSAA or the LIA or one of their regulations, such proof dispenses with the need to prove that the railroad was negligent, and negligence is established as a matter of law. *Id.* "Sometimes that violation is described as 'negligence per se,' but [the Supreme Court] ha[s] made clear . . . that that term is a confusing label for what is simply a violation of an absolute duty." *Carter v. Atlanta & St. Andrews Bay Ry. Co.*, 338 U.S. 430, 434 (1949). Once the statutory violation is established, only proof of causation is required; that is, the employee must prove that his injury resulted "in whole or in part" from the defendant's violation of the statute. *Id.*

With this framework in mind, the Court now turns to each party's motions for partial summary judgment.

## C.  Defendant's Motions for Partial Summary Judgment

### 1.  Count Two of Plaintiff's Complaint

Count Two of Plaintiff's Complaint alleges that "Defendant's violations of the Code of Federal Regulations, including use of radio and such other acts as constitute violations of operating rules and C.F.R. . . . . constitute strict liability of Defendant." (Compl. ¶ VIII.) In support of its motion, Defendant first argues that any alleged violations of the operating rules which Plaintiff identified as underlying Count Two cannot, as a matter of law, subject it to strict liability. (Def.'s Mem. at 17–19.) Second, Defendant argues that there is no

genuine issue of material fact as to whether it violated 49 C.F.R. § 220.45—the only federal regulation Plaintiff specifically identified as underlying Count Two. (*Id.* at 9–10.)

Plaintiff disagrees. First, he contends that Defendant's violations of its internal operating rules can in fact subject it to strict liability because those rules are incorporated by reference into 49 C.F.R. § 220.45, such that a violation of the operating rules amounts to a violation of that regulation. (Pl.'s Opp'n [Doc. No. at 37] at 1.) Second, Plaintiff argues that there are several issues of material fact in dispute as to whether Bergstad violated 49 C.F.R. § 220.45. (*Id.*) In light of the parties' arguments, this Court must determine the precise requirements of 49 C.F.R. § 220.45 before turning to the factual record.

### a.    Requirements of 49 C.F.R. § 220.45

In examining the meaning of a regulation, this Court first turns to the plain text of the regulation. *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009). Section 220.45, titled "Radio communication shall be complete," provides that "any radio communication which is not fully understood or completed in accordance with the requirements of this part and the operating rules of the railroad, shall not be acted upon and shall be treated as though not sent." 49 C.F.R. § 220.45. In other words, this regulation directs railroad employees to disregard a radio communication under two circumstances: (1) if they do not understand it, or (2) if the radio communication itself is not completed in accordance with the requirements of "this part" and "the operating rules of the railroad." *See Pierce v. Chi. Rail Link, LLC*, No. 03C7524, 2006 WL 3370343, at *6 (N.D. Ill. Nov. 20, 2006). By its plain text, then, 49 C.F.R. § 220.45 incorporates some of "the operating rules of the railroad." Precisely which of the railroad's operating rules are incorporated, however,

is a matter of vigorous dispute between the parties. Defendant argues that only radio-related operating rules are incorporated, whereas Plaintiff argues that *all* operating rules are incorporated.

To resolve this issue, the Court turns to well-established principles of statutory construction. *See Neb. Pharmacists Ass'n, Inc. v. Neb. Dep't of Soc. Servs.*, 863 F. Supp. 1037, 1046 (D. Neb. 1994) ("When a court construes an administrative regulation, the normal tenets of statutory construction are generally applied."). It is a basic tenet of statutory construction that a statute must be read as a whole. *See Engesser v. Dooley*, 686 F.3d 928, 936 (8th Cir. 2012) (citing *United States v. I.L.*, 614 F.3d 817, 820–21 (8th Cir. 2010)). Indeed, courts "may not look only at an isolated provision of a statute to construe its meaning." *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 728 (8th Cir. 2017) (citations omitted). It is settled law that "the plain meaning of a statute depends on its context." *Stanley v. Cottrell, Inc.*, 784 F.3d 454, 466 (8th Cir. 2015) (citing *King v. Ahrens,* 16 F.3d 265, 271 (8th Cir. 1994)).

Applying those principles here, when read in context and as whole, the plain text of 49 C.F.R. § 220.45 is clear: it incorporates only those operating rules of the railroad relating to radio communications. Particularly instructive to this Court's conclusion is 49 C.F.R. § 220.45's reference to "this part," or Part 220 of Title 49 ("Part 220"). Part 220 is titled "Railroad Communications" and relates solely to communications in connection with railroad operations.[3] Viewed within this framework, it would defy principles of statutory

---

[3] 49 C.F.R. § 220.1 sets forth the scope of Part 220, and provides:

construction to interpret the language "the operating rules of the railroad" contained in 49 C.F.R. § 220.45 as referencing anything other than the operating rules related to railroad communications.

Plaintiff's arguments to the contrary are unavailing. Plaintiff urges this Court to read 49 C.F.R. § 220.45 together with 49 C.F.R. § 217.7—a regulation requiring railroads to file with the Federal Railroad Administration ("FRA") "one copy of its code of operating rules"—to hold that 49 C.F.R. § 220.45 requires compliance with *all* of the operating rules of the railroad. (Pl.'s Opp'n at 13.) This Court cannot agree. It is unclear to this Court how a regulation that requires railroads to file their operating rules with the FRA bears on the issue of whether a radio regulation requires compliance with *all* of those operating rules. Section 217.7 is contained in Part 217 of Title 49, whose stated purpose is simply for the FRA to "learn[] the condition of operating rules and practices with respect to trains and other rolling equipment in the railroad industry." 49 C.F.R. § 217.1. The Court cannot discern how Part 217 or § 217.7 indicates that the entirety of a railroad's operating code is somehow incorporated wholesale into *all* FRA regulations.[4]

---

This part prescribes minimum requirements governing the use of wireless communications in connection with railroad operations. In addition, this part sets forth prohibitions, restrictions, and requirements that apply to the use of personal and railroad-supplied cellular telephones and other electronic devices. So long as these minimum requirements are met, railroads may adopt additional or more stringent requirements.

[4] Albeit in different contexts, several courts have reached a similar conclusion. *See, e.g.*, *S. Pac. Transp. Co. v. Pub. Util. Comm'n of Or.*, 9 F.3d 807, 812 n.5 (9th Cir. 1993) ("Because the FRA neither approves nor adopts the railroad's rules in any manner, the rules do not have the force of law . . . ."); *Civil City of S. Bend v. Consol. Rail Corp.*, 880 F. Supp. 595, 601 (N.D. Ind. 1995) (Section 217.7's requirement that "a railroad [] submit its

Similarly, this Court rejects Plaintiff's reliance on *Schmitz v. Canadian Pacific Railway Co.*, No. 05-C0369, 2006 WL 3488846 (E.D. Wis. Dec. 4, 2006), and *Kennedy v. Soo Line Railroad Co.*, No. A13-2311, 2015 WL 404381 (Minn. Ct. App. Feb. 2, 2015), to argue for a different result. Stated simply, those cases do not support Plaintiff's position. In *Schmitz*, a federal district court considered whether a railroad's violation of an internal safety rule constituted a violation of 49 C.F.R. §§ 214.313 and 214.311. *Schmitz*, 2006 WL 3488846, at *2. Section 214.313(a) provides that "[e]ach roadway worker is responsible for following the on track safety rules of the railroad upon which the roadway worker is located," and § 214.311(a) provides that "[e]ach employer is responsible for the understanding and compliance by its employees with its rules and the requirements of this part." *Id.* (first alteration in original). Analyzing the plain text of these regulations, the district court held that the regulations clearly "mandate that railroads and their roadway workers comply with their own safety rules." *Id.* Thus, the court found that the defendant had violated these regulations because one of defendant's employees had violated an internal safety rule of the railroad related to on-track safety. *Id.* The import of *Schmitz* for the purposes of this case, however, is simply what this Court already held above: that specific FRA regulations may, and do in fact, incorporate *some* of a railroad's operating rules by reference, such that a violation of the incorporated rules can constitute a violation of the regulations.

---

operating rules and [] instruct its employees about the operating rules does not elevate the operating rules to the status of federal law . . . .").

The import of *Kennedy* is the same. There, the court did consider 49 C.F.R. § 220.45, and stated that the "regulation requires not only compliance with federal regulations, but also compliance with each railroad's internal safety rules." *Kennedy*, 2015 WL 404381, at *4. However, the *Kennedy* court was not called to interpret 49 C.F.R. § 220.45 under circumstances similar to this case, as there is no indication that the plaintiff was alleging anything other than violations of operating rules related to radio communications. *Id.* at *3– 4. Thus, the *Kennedy* court went no further than to hold that the railroad had in fact violated one of its "radio-communication rule[s]," and therefore the *Kennedy* decision in no way supports Plaintiff's arguments that 49 C.F.R. § 220.45 requires that a railroad comply with *all* of its operating rules, even those unrelated to radio communications. *Id.* at *4.

In sum, 49 C.F.R. § 220.45 requires that a radio communication be disregarded if it is not understood or if it is not completed in accordance with the requirements of Part 220 and the railroad's radio-communication operating rules.

### b.    Factual Record

In light of the above, partial summary judgment in favor of Defendant is warranted if there is no evidence calling into question whether Bergstad understood all radio communications or whether the radio communications themselves comported with Part 220 and Defendant's relevant operating rules.

Based on a review of the entire record, and viewing the evidence in the light most favorable to Plaintiff, this Court finds that partial summary judgment is warranted in favor of Defendant. First, the record is devoid of any evidence indicating that Bergstad misunderstood the radio command instructing the crew to stop before the switch at

17

Foxholm. To the contrary, the record clearly evidences that Bergstad fully understood the radio command, but then simply forgot about it. At Defendant's investigative hearing, Bergstad was asked, in no ambiguous terms, if he "understood" that he had to stop at the east siding switch at Foxholm, and he responded, "Yes." (Investigative Hr'g Tr. at 11.) Bergstad's deposition testimony is fully in accord. Similarly, Plaintiff testified that at no point did Bergstad ever indicate that he did not understand the radio instructions. (Kukowski Dep. at 165–66 ("No, I don't think there's any time that he didn't understand them.").) In fact, even Byrnes, Plaintiff's own expert witness, opined that "[t]here is no evidence that Mr. Bergstad expressed any confusion and/or uncertainty to Mr. Kukowski about what compliance with the track warrant OK'd at 11:22 required of him before he started moving the train towards Foxholm." (Ex. I to Carrigan Aff. [Doc. No. 9] ("Byrnes Supp. Report") at 11.) In short, this uncontroverted evidence shows that Bergstad fully and completely understood the radio communication.

Plaintiff would have the Court reach a different conclusion, but his arguments are unpersuasive. Plaintiff primarily contends that the incident itself calls into question whether Bergstad understood the communication and is sufficient to preclude summary judgment when weighed in Plaintiff's favor. (Pl.'s Opp'n at 6.) According to Plaintiff, had Bergstad actually understood the radio communication, "then the train wreck should have never happened." (*Id.*) In light of the record evidence overwhelmingly demonstrating that Bergstad understood that he needed to stop to check the switch, Plaintiff's position is untenable and goes beyond the reasonable inferences this Court must make in his favor.

That the incident occurred is equally consistent with Bergstad forgetting about the switch, which is in fact why he had to use the emergency brake.

Plaintiff also contends that to grant partial summary judgment on this issue would result in the Court impermissibly making a credibility determination. He argues that Bergstad's credibility is not conceded, and that whether he should be believed is a question for the jury. (*Id.* at 8.) This Court disagrees. It is of course "well established that courts should neither weigh evidence nor make credibility determinations when ruling on a motion for summary judgment." *Nyari v. Napolitano*, 562 F.3d 916, 922 (8th Cir. 2009). However, the mere claim that testimony is perjured is insufficient to call into question otherwise uncontroverted evidence. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 81 (8th Cir. 1987). To defeat a motion for summary judgment, Plaintiff must allege specific facts that, "if proven, would call the credibility of the moving party's witness into doubt." *Id.* This, Plaintiff has failed to do.

Second, there is no evidence suggesting that the radio communication at issue failed to comply with Part 220 or Defendant's relevant operating rules.[5] In fact, when Plaintiff was asked if he "ha[d] any indication that the radio didn't work that day," Plaintiff answered, "No, I don't remember." (Kukowski Dep. at 132.) Moreover, Plaintiff testified that he had no difficulty sending or receiving any radio transmissions on the day of the incident. (*Id.* at

---

[5] The only internal operating rule related to radio communications that Plaintiff claims that Defendant violated is GCOR 2.6. (Pl.'s Opp'n at 7.) GCOR 2.6, titled "Communication Not Understood or Incomplete" mirrors 49 C.F.R. § 220.45, and provides:

> An employee who does not understand a radio communication or who receives a communication that is incomplete must not act upon the communication and must treat it as if it was not sent.

(*Id.*)

131.) And, tellingly, Plaintiff's own expert witness opined that "[t]here is no evidence that Mr. Bergstad had problems with the radio on the [locomotive] on May 2, 2014," and that "[g]iven that Mr. Bergstad was required to have his locomotive radio turned to the appropriate channel with the volume set so he could receive communications, it is reasonable to believe that he heard the track warrant issued by the train dispatcher and the readback for OK as the train sat behind the Lake Darling crossing." (Byrnes Supp. Report at 10.)

In sum, there is no record evidence calling into question Bergstad's compliance with 49 C.F.R. § 220.45. Accordingly, this Court grants Defendant's motion for partial summary judgment on Count Two of Plaintiff's Complaint.

### 2. Partial Summary Judgment on Crashworthiness Claims

As described above, after Defendant filed its original motion for partial summary judgment, it filed a supplemental motion also seeking partial summary judgment on any claim that it is liable for failing to pad the walkway on which Defendant hit his head. (*See* Def.'s Supp. Mot.) For ease of analysis, this Court will refer to such claim as a locomotive "crashworthiness" claim. Defendant contends that long after the deadline to amend pleadings, and after fact and expert discovery had concluded, Plaintiff now seeks to include "previously unpled" claims that Defendant's failure to pad the locomotive walkway constitutes a violation of LIA regulations and also supports his ordinary FELA negligence claim. (*See* Def.'s Supp. Mem.) The Court addresses each of these contentions below.

### a. Regulatory Violation under LIA

Defendant advances three reasons why this Court should grant partial summary judgment in its favor on any claim that it violated the LIA. First, Defendant argues that Plaintiff failed to adequately plead a LIA claim within the liberal timeline of the case. According to Defendant, such failure has unduly prejudiced it because it now faces the prospect of defending against that claim without the benefit of fact and expert discovery. Second, and somewhat relatedly, Defendant argues that Plaintiff has failed to identify a LIA regulation that would support a claim for lack of crashworthiness. Finally, Defendant argues that Plaintiff has "failed to produce the expert testimony required to substantiate a claim of locomotive defect crashworthiness under the LIA." (*Id.* at 1–2.)

In response, Plaintiff first argues that his LIA claim was adequately pled, as Count Two of his Complaint alleges violations of the C.F.R. and thus encompasses his LIA claim. (Pl.'s Supp. Opp'n [Doc. No. 45] at 3–4.) Next, for the first time in this litigation, Plaintiff identifies 49 C.F.R. § 229.205 as the LIA regulation that Defendant purportedly violated. (*Id.* at 4.) According to Plaintiff, this regulation required Defendant to meet the Association of American Railroads' ("AAR") standard "S-580, Locomotive Crashworthiness Requirements," which in turn requires "the interior of Defendant's locomotives to be safely padded 'to mitigate the consequences of an occupant impact' with hard surfaces." (*Id.* at 4–5 (quoting Ex. 3 to Fuller Decl. [Doc. No. 46-3] ("Crashworthiness Standards") at § 6.6.1).) Finally, Plaintiff argues that expert testimony is not required for this claim, as "[t]he jury can determine . . . whether Defendant complied with the applicable crashworthy safety standards." (*Id.* at 8.)

Here, the Court concludes that even assuming that Plaintiff's pleadings were sufficient to put Defendant on notice as to a potential LIA claim, partial summary judgment is warranted in favor of Defendant. In its response to Defendant's supplemental motion, Plaintiff's only argument for avoiding partial summary judgment on its LIA claim is that Defendant's failure to pad the walkway constituted a violation of 49 C.F.R. § 229.205. As Defendant points out, however, and Plaintiff's counsel conceded at oral argument, this locomotive-safety regulation only applies to locomotives "manufactured or remanufactured on or after January 1, 2009." 49 C.F.R. § 229.203; *see* Def.'s Supp. Reply [Doc. No. 48] at 3. Defendant produced the sworn affidavit of its Superintendent of Locomotive Maintenance indicating that the locomotive at issue was built by General Electric in 2003 and has not been remanufactured. (Aff. of Tim Mouland [Doc. No. 49] at ¶ 6.) And, fatal to Plaintiff's claim, he has not produced any evidence calling into question the date of manufacture of the locomotive, or whether it has been re-manufactured. Summary judgment in favor of Defendant is thus warranted, as Plaintiff has "fail[ed] to make a showing sufficient to establish the existence of an element essential to its case and on which [he] w[ould] bear the burden of proof at trial." *Duluth News-Tribune v. Medure*, 808 F. Supp. 671, 673 (D. Minn. 1992) (citing *Celotex*, 477 U.S. at 322–23).

The Court is careful to note that it is not deciding, as a matter of law, that Defendant's locomotive was indeed "crashworthy." Rather, it grants summary judgment in favor of Defendant because Plaintiff has failed to plead a theory under which it could prevail at trial on a violation of the LIA. At this stage in the proceedings, Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. Faced with Defendant's well-supported motion for partial summary judgment, Plaintiff has failed to carry its burden of establishing a genuine issue for trial.

> **b.    Negligence under FELA Based on Lack of Crashworthiness**

Defendant advances two arguments for why Plaintiff may not ground his FELA negligence claim on Defendant's purported failure to pad the locomotive. First, Defendant maintains that "[i]n the absence of a claim that the LIA (or an FRA regulation) governing locomotive cabs was violated, a garden-variety FELA negligence claim on alleged safety deficiencies in the design of a locomotive cab [is] precluded by the LIA." (Def.'s Supp. Mem. at 9.) In the alternative, Defendant argues that "[a]ny FELA claim based on allegations regarding locomotive design require expert testimony—which is absent from this case." (*Id.* at 7.)

Plaintiff vigorously disputes Defendant's assertions. First, he argues that FELA actions are not precluded by the LIA under the U.S. Supreme Court's preclusion analysis set forth in *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014). (Pl.'s Supp. Opp'n at 8–13.) Accordingly, he contends, he is permitted to argue that lack of padding "supports both his FELA negligence claim and his claim that Defendant violated the applicable [LIA] statutes and regulations." (*Id.* at 8.) Second, Plaintiff argues that expert testimony is not required because a jury can rely on its common sense to determine whether padding is needed on an overhead beam. (*Id.* at 6–8.)

Here, the Court need not address the issue of preclusion, because even assuming, without deciding, that Plaintiff's FELA negligence claim is not precluded by the LIA, summary judgment in favor of Defendant is warranted.  In this case, Plaintiff cannot establish that failure to pad the overhead beam amounts to negligence without expert testimony.

A general negligence claim under FELA requires that a plaintiff establish a prima facie case of negligence. This prima facie case "must include all the same elements as are found in a common law negligence action." *Davis*, 541 F.2d at 185. An employer's duty of care under FELA "turns in a general sense on the reasonable foreseeability of harm," and the "employer's conduct is measured by the degree of care that persons of ordinary, reasonable prudence would use under similar circumstances and by what these same persons would anticipate as resulting from a particular condition." *Ackley v. Chi. & N. W. Transp. Co.*, 820 F.2d 263, 267 (8th Cir. 1987) (citations omitted).

In keeping with FELA's remedial purpose, "courts have adopted a standard of liberal construction to facilitate Congress'[s] objectives." *Id.* (citing *Urie*, 337 U.S. at 180). Indeed, some Courts have opined that "the quantum of evidence required to establish liability in a FELA case is much less than in an ordinary negligence action." *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990) (cited with approval by *Cowden*, 690 F.3d at 896). And relatedly, "[t]he Supreme Court has emphasized the jury's role in determining whether an employer has breached its duties under the FELA." *Ackley*, 820 F.2d at 267. (citations omitted).

24

Nevertheless, this Court has found no indication that FELA disturbs "the general rule" that while not invariably required, "expert testimony is appropriate when the subject of inquiry is one which jurors of normal experience and qualifications as laymen would not be able to decide on a solid basis without the technical assistance of one having unusual knowledge of the subject by reason of skill, experience, or education in the particular field." *Beanland v. Chi., Rock Island & Pac. R.R. Co.*, 480 F.2d 109, 116 (8th Cir. 1973) (quoting *Associated Dry Goods Corp. v. Drake*, 394 F.2d 637, 644 (8th Cir. 1968)); *see Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 910 (7th Cir. 2012) (noting courts' "consistent holdings" that under FELA, "expert testimony is unnecessary where the matter is within the realm of lay understanding and common knowledge.") Consistent with this general rule, several district courts have held that expert testimony is required in cases, like this one, where a plaintiff's negligence claim is grounded on the railroad's failure to equip the locomotive cab with some sort of safety feature. *See, e.g.*, *Miciotto v. Brown*, No. Civ.A. 02-1485, 2003 WL 22326559, at *5 (E.D. La. Oct. 6, 2003) (holding that plaintiff's "allegations and conclusions," without supporting expert testimony, that "restraints and/or padding [in the locomotive] would have prevented his damages," were "simply insufficient to avoid summary judgment").

Here, without expert testimony, Plaintiff cannot establish a prima facie case of negligence under FELA grounded on a design defect in the locomotive. Whether one particular beam inside a locomotive must be padded is not a matter that "is within the knowledge or experience of laymen." *Bartak v. Bell-Galyardt & Wells, Inc.*, 629 F.2d 523, 530 (8th Cir. 1980) (citing *Bridger v. Union Ry.*, 355 F.2d 382, 387 (6th Cir. 1966)).

Underscoring this point are the very "crashworthiness" standards that Plaintiff alleged that Defendant had violated in his LIA claim. Section 6.6.1 of the AAR's standard S-580, "Locomotive Crashworthiness Requirements," provides that "[p]rotruding parts, sharp edges, and corners in a locomotive cab must be rounded, radiused, *or* padded to mitigate the consequences of an occupant impact with such surfaces." (*See* Crashworthiness Standards § 6.6.1.) In other words, it is not a foregone conclusion that all protruding parts or hard surfaces in a locomotive must be padded to render the locomotive safe or "crashworthy." To mitigate impact, hard surfaces could be rounded, radiused, or padded. In light of these alternative courses of conduct, without the aid of expert testimony, the jury would be unable to determine if Defendant breached its duty of care.[6]

On this point, the instant case is very similar to *Rice v. Cincinnati, New Orleans & Pacific Railway Co.*, where a federal district court granted the defendant's motion in limine to exclude testimony.  920 F. Supp. 732, 736–38 (E.D. Ky. 1996). In that case, a railroad engineer sued his employer under FELA to recover damages for the injuries he sustained when his train collided with a car. *Id.* at 734. The plaintiff there argued that the railroad had failed to provide him with a safe place to work because the locomotive had no seatbelt or other restraining device, and because the engineer's chair was so large that the plaintiff was unable to easily enter and exit the chair. *Id.* Prior to trial, the plaintiff sought to introduce the

---

[6] The Court acknowledges that there is evidence indicating that Plaintiff complained to Defendant about the walkway and requested padding. To be sure, such evidence goes to the issue of foreseeability of harm as well as to whether Defendant's conduct was reasonable. But complaining about a potentially "defective" condition alone is not enough; the jury must be able to evaluate whether, given the technical nature of locomotive design, Defendant's failure to pad the walkway amounts to negligence.

testimony of his fellow trainmen who opined that the "the cab of the engine in which plaintiff was riding [wa]s not properly designed." *Id.* at 736. The court excluded the testimony, stating that

> [I]it is readily apparent that [plaintiff's fellow trainmen] do not have the qualifications to offer expert opinion that the engine cab design is unsafe. Many factors would have to be considered beyond the size of the seat to offer such an opinion. What other ergonomic functions must the seat fulfill? If it were smaller, would this increase the engineer's fatigue or otherwise affect his or her performance? Such questions are beyond the expertise of the proffered trainmen and address themselves to an expert in ergonomics or engine design.

*Id.* at 737.

The same considerations apply here. Many factors must be considered in the design of walkways inside of locomotive cabs. Is it sufficient to round or radius an overhead beam? Or, if padding is deemed essential, what material must be used? And what thickness should this material be? Like the issues presented in *Rice*, such questions are beyond the expertise of a lay jury and require the testimony of an expert in such matters.

Additionally, although not directly applicable because they do not involve FELA's more liberal construction, decisions by the Eighth Circuit regarding ordinary negligence support this Court's conclusion.[7] For instance, in the oft-cited case of *Dancy v. Hyster Co.*, 127 F.3d 649, 654–55 (8th Cir. 1997), the Eighth Circuit affirmed the district court's grant of summary judgment in favor of the defendant for lack of admissible expert testimony. In *Dancy*, the plaintiff sued a lift truck manufacturer after the lift truck he was operating

---

[7] At oral argument, the Court requested that Plaintiff provide FELA cases supporting his position. However, Plaintiff only brought to this Court's attention a case which simply sets forth the standard for when expert testimony is unnecessary. (*See* Letter to Dist. Judge [Doc. No. 54].)

overturned, pinning plaintiff's right foot. *Id.* at 651. Relevant here, the plaintiff argued that the manufacturer was negligent for "failing to place a cage or guard around the operator's compartment" which could have prevented the operator from being pinned under the lift truck. *Id.* The district court first excluded the plaintiff's expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and then granted summary judgment in favor of the defendant, concluding that the plaintiff could not prevail without an expert witness. *Id.* at 651. The Eighth Circuit affirmed in both respects, holding that "absent expert testimony, there is no basis for the jury to evaluate the actions of an ordinary prudent person in the same situation as [the lift truck manufacturer]." *Id.* at 654.  The Eighth Circuit noted:

> We cannot expect lay jurors to possess understanding about whether the mesh guard envisioned . . . would be capable of withstanding the force involved in a fall and be effective in protecting Plaintiff from the injury he received. . . . We cannot expect a lay juror to know whether the mesh guard itself would cause more injuries than it creates by, for instance, breaking and puncturing the lift truck's operator.

*Id.* at 653. As discussed above, the same considerations hold true in this case. Plaintiff's arguments to the contrary simply fail to account for these considerations.

In sum, this Court concludes that without expert testimony, Plaintiff may not base his FELA negligence claim on Defendant's purported failure to pad the locomotive. Because such testimony is missing, this Court grants Defendant's supplemental motion for summary judgment in all respects.

### D. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment on three issues: (1) whether Defendant's broken knuckle constitutes a *per se* violation of the FSAA and thus negligence

as a matter of law under FELA; and (2) whether Defendant may assert a defense of contributory negligence at trial.  Each issue is addressed in turn.

## 1. FSAA Violation

Like the LIA, the FSAA is considered an amendment to FELA, *Urie*, 337 U.S. at 189, and imposes "absolute duties on railroads to provide required safety equipment on their trains." *Grogg v. Mo. Pac. R.R. Co.*, 841 F.2d 210, 212 (8th Cir. 1988) (citation omitted). And like with the LIA, if a plaintiff proves a violation of the FSAA, he may recover under FELA without having to prove negligence. *Id.* To recover under FELA for a violation of the FSAA, a plaintiff must show "(1) [that] the statute was violated; and (2) [that] the violation was 'a causative factor contributing in whole or in part to the accident' that caused h[is] injuries." *Id.* (quoting *Beimert v. Burlington N., Inc.*, 726 F.2d 412, 414–15 (8th Cir. 1984) (per curiam)). To show that the statute was violated, a plaintiff may show evidence of "some particular defect" in the equipment. *Id.* (quoting *Myers v. Reading Co.*, 331 U.S. 477, 483 (1947)). However, proof of an actual defect is not required; "[t]he test in fact is the performance of the appliance," so a violation may be established "by showing a failure to function, when operated with due care, in the normal, natural, and usual manner." *Id.* (quoting *Myers*, 331 U.S. at 483). Proof that Defendant violated a railroad-safety regulation will have the same effect under FELA as a violation of the FSAA itself. *See, e.g.*, *Morant v. Long Island R.R.*, 66 F.3d 518, 523 (2d Cir. 1995*); Walden v. Ill. Cent. Gulf R.R.*, 975 F.2d 361, 364 (7th Cir. 1992); *Eckert v. Aliquippa & S. R.R. Co.*, 828 F.2d 183, 187 (3d Cir. 1987).

Plaintiff contends that it is entitled to judgment as a matter of law on whether Defendant violated 49 U.S.C. § 20302 and 49 C.F.R. § 215.123.

### a.    Violation of 49 U.S.C. § 20302(a)(1)(A)

In relevant part, 49 U.S.C. § 20302(a)(1)(A) provides that a railroad may not use a vehicle unless it is equipped with "couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles . . . ."  Plaintiff contends that Defendant's broken knuckle constitutes a *per se* violation of § 20302(a)(1)(A), as under *O'Donnell v. Elgin, Joliet & E. Ry. Co.*, 338 U.S. 384 (1949), that provision requires train knuckles to remain coupled until set free by some purposeful act of control. (Pl.'s Mem. at 12–16.)

This Court agrees with Plaintiff that *O'Donnell* controls and compels summary judgment in his favor. *O'Donnell* involved the death of a railroad employee who was crushed between two railcars. 338 U.S. at 385–86. As explained by the Supreme Court, a coupler's failure allowed some rail cars to "run free" and cause the movement of the cars that crushed the plaintiff. *Id.* The issue facing the Court was whether a "failure of couplers to remain coupled until released constitute[d] or evidence[d] a violation" of the Safety Appliance Act—the predecessor to the FSAA.[8] *Id.*

---

[8] At that time, the relevant statute provided, "It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." *O'Donnell*, 338 U.S. at 387 n.2.

In a straightforward decision, the Supreme Court held that the failure of couplers to remain coupled until released constitutes a violation of the Safety Appliance Act. *Id.* at 389. The Court reasoned that

> [I]t [is] difficult to read the Safety Appliance Act to require that cars be equipped with appliances which couple automatically by impact and which may be released without going between the ends of cars, but which need not remain coupled in the meantime. The Act so construed would guard against dangers incident to effecting an engagement or disengagement while ignoring the even greater hazards which can result from the failure of a coupling to perform its main function, which is to stay coupled until released.

*Id.* The Court thus concluded that "the Safety Appliance Act requires couplers which, after secure coupling is effected, will remain coupled until set free by some purposeful act of control." *Id.*

Here, it is undisputed that the knuckle on Defendant's train broke, or in other words, that it failed to "remain coupled until set free by some purposeful act of control." *Id.* Under the clear language of *O'Donnell*, a knuckle which fails to remain coupled until released constitutes a *per se* violation of the FSAA. Accordingly, summary judgment is warranted in favor of Plaintiff on this issue.

Defendant advances several contrary arguments, but each is foreclosed by the reasoning and language in *O'Donnell*. Defendant argues that because its knuckle "'performed as it was designed' and was not defective," (Def.'s Opp'n [Doc. No. 39] at 10), its failure cannot constitute a *per se* violation of the statute, (*id.* at 15–17). Defendant stresses that its knuckle was properly built per the "Grade E" specification from the AAR, and failed because the draft forces of the train exceeded what the knuckle is built to

withstand. (*Id.* at 16.) But the *O'Donnell* Court rejected that line of reasoning. The Court was clear that "[a] defendant cannot escape liability for a coupler's inadequacy by showing *that too much was demanded of it*, nor by showing that while the coupler broke *it had been properly manufactured, diligently inspected and showed no visible defects*." 338 U.S. at 393 (emphasis added). In fact, the *O'Donnell* Court went as far as to state that "the [Safety Appliance] Act certainly requires equipment that will withstand the stress and strain of all ordinary operation, grades, loadings, stops and starts, *including emergency stops*." *Id.* (emphasis added). Faced with this clear language, this Court cannot accept Defendant's arguments that such a rule is neither fair nor technologically feasible.

As explained above, however, a FELA claim predicated on a FSAA violation requires that Plaintiff prove both the statutory violation, and that such violation caused his injuries.  In keeping with the Supreme Court mandate that FELA be liberally construed, courts apply a relaxed standard of causation. *Gottshall*, 512 U.S. at 543. "If an employee is injured because of an unsafe condition, the employer is liable 'if its negligence played any part, even the slightest, in producing the employee's injury.'" *Payton v. St. Louis Sw. Ry. Co.*, 962 F.2d 832, 833 (8th Cir. 1992) (quoting *Davis*, 541 F.2d at 185). Plaintiff argues that because "FELA's language on causation . . .'is as broad as could be framed,'" there is no genuine issue of material fact as to whether the broken knuckle, causing the train to separate in two, played any part, even the slightest, in producing his injuries. (Pl.'s Reply [Doc. No. 44] at 6.) Defendant disagrees. It contends that "there is a well-defined factual dispute about the causal relationship between the broken knuckle and Plaintiff's fall in the

locomotive cab," precluding summary judgment on the issue of causation. (Def.'s Opp'n at 18.)

Here, the Court agrees with Defendant that the parties' dueling theories of causation—each supported by expert testimony—present the quintessential issue of fact for the jury. *See, e.g.*, *O'Donnell*, 338 U.S. at 386 ("We need not resolve the conflict between these competing theories of causation, for that decision was for the jury."). Plaintiff's expert contends that Plaintiff's injuries undoubtedly resulted from the broken knuckle, as without the knuckle's failure, the train would not have separated and a collision of its two segments would never have occurred. Defendant's expert disagrees, arguing that the two train segments did not collide and thus the knuckle's role in the incident is not so clear cut. It will be up to the jury to decide which theory it accepts.

Accordingly, although the Court holds that Defendant violated § 20302(a)(1)(A) as a matter of law, factual disputes preclude summary judgment on the issue of causation.

### b.    Violation of 49 C.F.R. § 215.123(c)

Section 215.123, titled "Defective couplers," provides, in part, that "[a] railroad may not place or continue in service a car, if . . . [t]he car has a coupler knuckle that is broken or cracked on the inside pulling face of the knuckle." 49 C.F.R. § 215.123(c). The plain language of this regulation prohibits a railroad from "plac[ing]" or "continu[ing] in service" a car under two circumstances: if the knuckle in the car is broken, or if the knuckle is cracked in a particular location. *See id.*

Plaintiff argues that because Defendant's knuckle broke, "there can be no honest argument that the coupling mechanism at issue was compliant with [this regulation]." (Pl.'s

Mem. at 17.) Defendant disagrees. He highlights that the parties' liability experts agree that the fracture in the knuckle was a "new" fracture—and thus the railroad did not "place" in service a car with a broken or crackled knuckle—and also that Defendant immediately replaced the broken knuckle—and thus did not "continue in service" a car with a broken or cracked knuckle. (Def.'s Opp'n at 22.)

This Court agrees with Defendant that evidence in the record precludes summary judgment on this issue. Substantial record evidence indicates that the fracture in the knuckle was a "new" break. As just one example, in the "Break-In-Two Report" that Bergstad completed after the incident, he circled "New" when asked if the knuckle's failure was "New or Old." (*See* Ex. Q. to Carrigan Supp. Aff. [Doc. No. 40-4].) This evidence creates a genuine factual dispute as to whether the railroad "placed" or "continued in service" a car with an already broken or cracked knuckle.[9] Additionally, as already explained above, the jury will also have to determine whether Defendant's alleged violation of 49 C.F.R. § 215.123(c) caused Plaintiff's injuries.

### 2. Contributory Negligence

Plaintiff next argues that it is entitled to partial summary judgment on Defendant's defense of contributory negligence. Plaintiff contends that because Defendant violated the FSAA, Defendant may not, as a matter of law, assert the defense of contributory

---

[9] In a footnote in the "Statement of Facts" section of his brief, Plaintiff states that "Defendant's failure to preserve the physical evidence has prevented [him] from retaining an expert metallurgist to determine whether the knuckle had any old or existing defects making it even more susceptible to a fracture." (Pl.'s Mem. at 5 n.3.) As such, Plaintiff argues, this Court should draw any inferences against Defendant and preclude it from arguing that the fracture in the knuckle was new. (*Id.*; *see also* Pl.'s Reply [Doc. No. 44] at 3 n.1.) The Court declines to do so, as the record is not developed on that issue.

negligence. (Pl.'s Mem. at 17–19.) Moreover, Plaintiff argues, even if the defense were available to Defendant, the facts do not support such a defense, and thus Plaintiff is entitled to partial summary judgment. (*Id.* at 19–24.) On this point, Plaintiff contends that the facts that Defendant will rely on only support an assumption of risk defense, which is wholly unavailable under FELA, and not contributory negligence. Defendant counters that because causation on the FSAA claim has not been established, and Plaintiff also asserts general negligence under FELA, summary judgment on the availability of the contributory negligence defense is improper.  (Def.'s Opp'n at 19.) Moreover, while Defendant concedes that FELA completely bars the assumption of risk defense, it stresses that it has never pled such a defense and does not plan to do so. (*Id.* at 23–24.) However, it argues that courts may not exclude evidence of contributory negligence merely because such evidence may also be pertinent to an assumption of risk argument. (*Id.* at 24–29.)

"In order to further FELA's humanitarian purposes, Congress did away with several common-law tort defenses that had effectively barred recovery by injured workers." *Gottshall*, 512 U.S. at 542. Specifically, the statute "rejected the doctrine of contributory negligence in favor of that of comparative negligence . . . [and] abolished the assumption of risk defense." *Id.* (citing 45 U.S.C. §§ 51, 53–55). Thus, a plaintiff's contributory negligence will not bar recovery, but it may reduce damages. *Beimert*, 726 F.2d at 414 n.3.  However, "contributory negligence may not reduce damages when the claim is founded on a violation of the [Federal] Safety Appliance Act." *Id.* (citing 45

U.S.C. § 53).[10] In other words, contributory negligence remains a viable partial defense to a claim of general negligence, but it may not be used when a claim is predicated on a statutory violation.

Based on this framework, the Court agrees with Plaintiff that, as a matter of law, Defendant may not assert contributory negligence as a defense to Plaintiff's FSAA claim (Count Three of the Complaint). Under 45 U.S.C. § 53, once a violation of the FSAA is established, as is the case here, a plaintiff's contributory negligence, if any, may not be considered at all. As the Eighth Circuit has stated, where liability is predicated on a defendant's failure to comply with the requirements of the FSAA, "[n]ot only is proof of negligence on behalf of defendant, other than the failure to comply with the statutory requirement, not necessary to establish liability, but neither is contributory negligence nor assumption of risk a defense in such an action." *Byler v. Wabash R. Co.*, 196 F.2d 9, 11 (8th Cir. 1952). And contrary to Defendant's contentions, the fact that causation on Plaintiff's FSAA claim is still in dispute is irrelevant to the question of whether Defendant may assert contributory negligence as a defense to that claim. Of course, to ultimately recover damages under FELA based on Defendant's statutory violation, Plaintiff must prove causation, as described above. But the issue of causation is wholly

---

[10] In relevant part, 45 U.S.C. § 53 provides,

> In all actions [under FELA] . . . the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: *Provided*, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

distinct from the issue of whether Defendant may assert contributory negligence as a defense to that claim. *See Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 507 n.13 (1957) ("Proof of a violation of certain safety-appliance statutes without more proves negligence and also eliminates contributory negligence as a consideration for any purpose. The only issue then remaining is causation." (internal citation omitted)). Accordingly, Plaintiff's motion for partial summary judgment is granted to the extent it seeks to preclude Defendant from asserting contributory negligence as a defense to Count Three of Plaintiff's Complaint.

Nevertheless, contributory negligence remains a viable partial defense to Plaintiff's general negligence claim under FELA (again, only to reduce damages). A defendant is "entitled to a jury instruction on contributory negligence if there is *any* evidence to support that theory." *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 978 (8th Cir. 1995) (emphasis added) (citing *Wilson v. Burlington N., Inc.*, 670 F.2d 780, 782 (8th Cir. 1982)). Accordingly, the "partial defense of contributory negligence cannot be denied the railroad merely because the evidence relating thereto may also be pertinent to assumption of risk." *Beanland*, 480 F.2d at 116 n.5. It is only when the evidence relates solely to assumption of risk that a trial judge may deny the contributory negligence instruction. *Hose*, 70 F.3d at 978 (citing *Birchem*, 812 F.2d. at 1049). Given this framework, it becomes critical to determine whether a defendant's evidence relates solely to the barred assumption of risk defense, or whether such evidence also supports a contributory negligence defense.

In *Birchem v. Burlington Northern Railroad Co.*, the Eighth Circuit endorsed the Ninth Circuit's explanation of "the subtleties of the two common-law doctrines within the context of FELA." 812 F.2d at 1049. Quoting the Ninth Circuit, the Eighth Circuit noted:

> Although there is some overlap between assumption of risk and contributory negligence, generally the two defenses are not interchangeable. At common law an employee's voluntary, knowledgeable acceptance of a dangerous condition that is necessary for him to perform his duties constitutes an assumption of risk. *Contributory negligence, in contrast, is a careless act or omission on the plaintiff's part tending to add new dangers to conditions that the employer negligently created or permitted to exist.* Defenses once embraced substantially within the concept of assumption of risk are barred under the FELA and may not be revived in the form of contributory negligence. Where an act of alleged contributory negligence is but the practical counterpart of assumption of risk, it does not constitute a defense.

*Id.* (quoting *Taylor v. Burlington N. R.R.*, 787 F.2d 1309, 1316 (9th Cir. 1986)). In other words, assumption of risk involves knowingly performing ordinary job duties in dangerous conditions, whereas contributory negligence involves failure to exercise ordinary care, thereby adding new dangers to the workplace. Applying those principles to the case before it, the *Birchem* court found that the defendant had not produced any evidence that the plaintiff had in any way failed to exercise due care. *Id.* at 1049–50.

In that case, the plaintiff was injured on two different occasions. First, the plaintiff was injured when he "butted" a door shut (instead of closing it with hands), and the "wind caught the door and slammed the doorknob into his back." *Id.* at 1048. The second injury occurred when a defective "mudjack" caused plaintiff to fall and again injure his back. *Id.* The plaintiff testified that he knew the mudjack was defective and that he was also aware of the railroad's safety rules forbidding the use of unsafe or defective equipment. *Id.* at 1048–49. The trial court refused to give a contributory negligence

instruction to the jury, and the Eighth Circuit affirmed. With respect to the incident involving the door, the Eighth Circuit reasoned that "given the realities of the workplace, [the plaintiff's] action in closing the door with his hip instead of his hand did not alone constitute a lack of due care justifying a jury instruction." *Id.* at 1050. As to the use of the mudjack, the Eighth Circuit held that "[plaintiff]'s use of the mudjack in a defective condition constituted assumption of risk, a defense disallowed by the FELA. Nothing in the record indicate[d] any lack of due care after [plaintiff] began operating the machine." *Id.* at 1049 (internal citation omitted). In so holding, the Eighth Circuit rejected the railroad's argument that "[plaintiff]'s violation of safety rules is sufficient evidence to establish his negligence and make it a jury question." *Id.*

In contrast, in *Martinez v. Union Pacific Railroad. Co.* and in *Hose v. Chicago Northwestern Transportation Co.*, the Eighth Circuit found that the trial court's contributory negligence instruction was supported by the evidence. In *Martinez*, the plaintiff stepped off a ramp and fell five feet to the ground, injuring his neck and back. 82 F.3d 223, 225 (8th Cir. 1996). The jury found the defendant liable under FELA, but apportioned 25% fault to the plaintiff. *Id.* The Eighth Circuit upheld the trial court's contributory negligence instruction, noting that the plaintiff had a duty to be alert and attentive when he walked on the ramp and to exercise reasonable care for his own safety. *Id.* at 229. Likewise, in *Hose*, the plaintiff sued his employer under FELA, claiming that the reclamation center in which he worked exposed him to manganese, a toxin. 70 F.3d at 972. The jury found defendant liable, but found that Hose was ten percent contributorily at fault. *Id.* The Eighth Circuit upheld the contributory negligence instruction, finding

that the jury could have reasonably inferred from the evidence that "[plaintiff] occasionally failed to take advantage of the ventilation equipment and warnings (however inadequate) provided by [defendant], which goes beyond accepting a dangerous condition as an ordinary job duty and constitutes the lack of due care by the employee." *Id.* at 978.

Under this framework, the record evidence, when viewed in the light most favorable to Defendant, precludes summary judgment on Defendant's contributory negligence defense to Plaintiff's general negligence claim. Here, there is at least some evidence to support Defendant's arguments that Plaintiff was contributorily negligent because he allegedly (1) forgot about the need to stop the train; (2) failed to remain alert and attentive, in violation of internal rules, by prematurely getting out of his seat while the train was still moving and, while standing, failing to "employ three-point contact with the locomotive to avoid falling down;" and (3) failed to follow Defendant's rules requiring him to hold a "job briefing" before leaving Lake Darling. (Def.'s Opp'n at 27.) Although these issues are heavily disputed, if established at trial, they could support Defendant's contention that Plaintiff failed "to be alert and attentive when performing his duties and to exercise reasonable care for his own safety," and was thus contributorily negligent. *Martinez*, 82 F.3d at 229.

Plaintiff contends that "Defendant may not rely on any general safety rules telling employees that they should not get hurt and to be alert," and that any argument that Plaintiff violated "self-serving" safety rules is no defense to a FELA claim. (Pl.'s Mem. at 22–23.) But Plaintiff cites no binding authority supporting that proposition, and, in fact, his argument seems to be foreclosed by Eighth Circuit precedent. In *Ackley v.*

*Chicago and North Western Transportation Co.*, the Eighth Circuit reiterated that it has "held that an employee's failure to obey safety rules may be considered by the jury in assessing contributory negligence." 820 F.2d at 268 (citations omitted). Thus, whether Plaintiff in fact violated internal safety rules, while not dispositive, may bear on a jury's determination of contributory negligence. The Court thus denies Plaintiff's motion for partial summary judgment to the extent it seeks to prevent Defendant from asserting contributory negligence as a partial defense to Plaintiff's general negligence claim.[11]

In sum, the Court grants Plaintiff's motion for partial summary judgment as follows. The Court holds that, as a matter of law: (1) Defendant violated 49 U.S.C. § 20302(a)(1)(A); and (2) Defendant may not assert contributory negligence as a defense to Plaintiff's FELA claim predicated on a violation of the FSAA.  Plaintiff's motion for partial summary judgment is denied in all other respects.

## III.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Partial Summary Judgment under Federal Rule of Civil Procedure 56 [Doc. No. 26], including the issues raised in Defendant's Supplemental Memorandum of Law [Doc. No. 41], is **GRANTED** as detailed herein; and

2. Plaintiff's Motion for Partial Summary Judgment under Federal Rule of Civil Procedure 56 [Doc. No. 30] is **DENIED IN PART AND GRANTED IN PART** as detailed herein.

---

[11] The Court notes that it is of course not making a final determination that a jury instruction on contributory negligence will in fact be given at the conclusion of trial.

41

3. This case is set for **TRIAL on June 11, 2018 at 10 a.m.** before Judge Susan Richard Nelson in Courtroom 7B at the United States Courthouse, 316 North Robert Street, St. Paul, Minnesota 55101. A pretrial conference will be held on May 11, 2018 at 1:30 p.m. A separate pretrial order with details will be issued at a later date.

Dated: February 12, 2018                     s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge